UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

ALAN LEE DELVECCHIO,                          CIVIL NO. 08-2220 (JNE/JSM)

     Petitioner,

v.                                           REPORT AND RECOMMEDNATION

TIMOTHY WENGLER,

     Respondent.

JANIE S. MAYERON, United States Magistrate Judge

This matter is before the undersigned United States Magistrate Judge on Alan Lee Delvecchio's Petition for Habeas Corpus by a Person in State Custody [Docket No. 1]. The case has been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

## I.   PROCEDURAL BACKGROUND

In 2005, Petitioner was convicted in the state district court for St. Louis County, on multiple charges of criminal sexual conduct. He was sentenced to 144 months in prison.

On March 18, 2008, Petitioner filed a petition for writ of habeas corpus ("March Petition") and made a request for a stay and abeyance of his March Petition. See DelVecchio v. State of Minnesota, Civil Case No. 08-739 (JNE/JSM) [Docket No. 1]; Petitioner's Memorandum in Support of Petition at p. 3 [Docket No. 3].

On March 25, 2008, this Court recommended that the March Petition be summarily dismissed without prejudice because it contained mixed claims, i.e. claims that were exhausted and claims that were unexhausted. See Del Vecchio v. Minnesota,

1

Civ, No. 08-739 (JNE/JSM) [Docket No. 5], 2008 WL 1757982 (D. Minn. April 17, 2008) (Order adopting Report and Recommendation dated March 25, 2008).  To address this mixed petition, Petitioner was given two choices: the March Petition could be dismissed without prejudice so that he could return to the state courts to attempt to pursue his unexhausted claims, and then seek federal habeas review again (if necessary) after the state courts had decided all of the claims that he sought to present in federal court.  Id. at *4.  Or alternatively, he could elect to abandon his unexhausted claims, and proceed with an amended petition that included only his fully exhausted claims.  Id.

On March 31, 2008, Petitioner submitted a letter to the Court stating that he did not wish to file an amended petition, and that he would instead file for post-conviction relief in Minnesota state courts.  See Letter to Clerk of Court dated March 31, 2008 [Case No. 08-739, Docket No. 7].  Consequently, the Report and Recommendation was adopted on April 17, 2008, and the March Petition was dismissed without prejudice.  Del Vecchio, 2008 WL 1757982 at *1.

On June 13, 2008, Petitioner filed the present Petition for writ of habeas corpus, which contains his four exhausted claims:

> A.    Ground One: Impermissible expert testimony.   The trial court committed error by allowing the states [sic] expert witnesses to testify about recantation theories and why they believed the recantation in this case was false as well as to testify they believed the complainant had been sexually abused, thus vouching for her credibility at the same time she made her initial report.
>
> B.    Ground Two: Insufficient evidence.  The evidence at trial was insufficient as a matter of law to sustain petitioners [sic] conviction when there was no direct evidence that petitioner was guilty of charged offense.

C.     Ground Three:   Petitioner was denied a fair trial. Petitioner was denied a fair trial by the courts [sic] refusal to grant petitioners [sic] motion for a mistrial after the state asked leading and confusing questions of complainant on direct examination.

D.     Ground Four: Brady violation[.]   Prosecutor erred withholding evidence and from the defense violating the brady rule and petitioners [sic] constitutional rights under the U.S. Const. Amend. Fifth, Sixth, and Fourteenth and Minnesota constitutional Article I §§ 3, 10.

See Petition at pp. 5-6.

At the same time as the Petition was filed, Petitioner filed a Motion for Stay and Abeyance so that the state could address on his non-exhausted claims.[1]   [Docket No. 2].  After receiving briefing on the issue from both Petitioner and Respondent, this Court denied the motion.   See November 17, 2008 Order [Docket No. 14], aff'd by February 24, 2009 Order [Docket No. 17].   On February 27, 2009, this Court ordered that on or before March 25, 2009, Petitioner was to either notify the Court in writing that he would be proceeding on the Petition as currently filed, or withdraw the Petition by filing a notice of voluntary dismissal, pursuant to Rule 41(a) of the Federal Rules of Civil Procedure. See February 27, 2009 Order [Docket No. 18].  The Court notified Petitioner that to the extent he did not notify this Court in writing that he would be proceeding on the current Petition, or file a notice of voluntary dismissal of the Petition, then this Court would proceed to adjudicate the merits of the claims asserted in the current Petition.  Id.  This Court received no notification by March 25, 2009 from Petitioner as to whether he would

---

[1]     Petitioner did file a petition for post-conviction relief arguing that 1) his trial counsel was ineffective; and (2) his Confrontation Clause rights were violated. DelVecchio v. State, 2009 WL 2596098 (Minn. Ct. App. Aug. 20, 2009) at *1, review denied (Minn. Dec. 23, 2009).   The district court denied the petition, the Minnesota Court of Appeals affirmed, and the Minnesota Supreme Court denied review.  Id.

be proceeding on the Petition as currently filed or that he was withdrawing his Petition. The Court then ordered Respondent to answer the Petition and to file the transcripts of Petitioner's jury trial. [Docket Nos. 20, 24]. Respondent has filed a response to the Petition [Docket No. 22] and Petitioner filed a response to Respondent's answer to his Petition [Docket No. 31]. On May 18, 2010, Respondent completed its production regarding the underlying record. See Docket No. 35.

## II.    STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs a federal court's review of habeas corpus petitions filed by state prisoners. Section 2254 of the AEDPA provides that a district court will entertain a petition for writ of habeas corpus submitted by a person in custody pursuant to a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

In addition, 28 U.S.C. § 2254 provides that a habeas corpus petition:

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Here, while Petitioner does not explicitly state whether he was proceeding under 28 U.S.C. § 2254(d)(1) or (2), it is evident from the substance of his Petition that he is raising challenges under both § 2254(d)(1) and (2).

The Court of Appeals for the Eighth Circuit has described the review under § 2254(d)(1) as follows:

> A decision is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or if it "confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent" but arrived at an opposite result. <u>Williams v. Taylor</u>, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court "unreasonably applies" federal law when it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or "unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." <u>Id.</u> at 407.
>
> A federal court may not issue the writ simply because it "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411.

<u>Engesser v. Dooley</u>, 457 F.3d 731, 735-36 (8th Cir. 2006). Under this standard, the federal court "must deny a writ – even if we disagree with the state court's decision – so long as that decision is reasonable in view of all the circumstances." <u>May v. Iowa</u>, 251 F.3d 713, 716 (8th Cir. 2001) (citation omitted).

By its terms, it is important to remember that § 2254(d)(1) "limits the benchmark precedent against which a habeas court may measure a state court decision to 'clearly established Federal law, as determined by the Supreme Court of the United States.'" <u>O'Brien v. Dubois</u>, 145 F.3d 16, 20 (1st Cir. 1999), *overruled on other grounds*. Thus,

even if lower federal court decisions support Petitioner's position, "the writ cannot issue unless the state court decision contravenes, or involves an unreasonable application of, extant Supreme Court jurisprudence." Id. Nevertheless, "[t]o the extent that 'inferior' federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness of the state court's resolution of the disputed issue." Atley v. Ault, 191 F.3d 865, 872 (8th Cir. 1999) (citing O'Brien, 145 F.3d at 25) ("If no Supreme Court precedent is dispositive of a petitioner's claim, then, a fortiori, there is no specific rule to which the state court's decision can be 'contrary.' In such circumstances, a federal habeas court then determines whether the state court decision reflects an unreasonable application of clearly established Supreme Court jurisprudence. This reduces to a question of whether the state court's derivation of a case-specific rule from the Court's generally relevant jurisprudence appears objectively reasonable. To the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness vel non of the state court's treatment of the contested issue.").

Under § 2254(d)(2), a state court decision involves "an unreasonable determination of the facts in light of the evidence presented in state court proceedings," only if it is shown that the state court's presumptively correct factual findings do not enjoy support in the record. 28 U.S.C. § 2254(e)(1). Pursuant to § 2254(e)(1):

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

With these standards of review in mind, this Court now turns to Grounds One through Four of the Petition.

## III.    DISCUSSION

### A.    Ground One: Expert's Testimony Relating to Victim's Reliability

On the issue of the admission of the expert testimony on the victim's alleged sexual abuse, the Minnesota Court Appeals summarized the facts and issues as follows:[2]

> The trial court denied defense counsel's pretrial motion not to allow the child psychologist to offer opinion testimony as to whether R. was sexually abused.
>
> * * *
>
> Minnesota law supports the admission of expert testimony about the behavioral characteristics of a child that are consistent with sexual abuse. See State v. Myers, 359 N.W.2d 604, 609-10 (Minn. 1984) (ruling that expert testimony on behavioral traits and characteristics typical of sexually abused child exhibited by particular victim are admissible). Expert opinion testimony on whether a complainant was sexually abused is admissible, as long as the expert does not offer an opinion on the identity of the person who committed the abuse. See State v. Dana, 422 N.W.2d 246, 250-51 (Minn. 1988); see also State v. Campa, 390 N.W.2d 333, 335 (Minn. Ct. App. 1986) (stating that expert opinion on whether victim has been abused was "proper testimony"), review denied (Minn. Aug. 27, 1986). Neither the child psychologist nor R.'s treating psychologist

---

[2]     In accordance with 28 U.S.C. § 2254(e)(1), the findings of fact made by the Minnesota trial and appellate courts are presumed correct unless rebutted by the Petitioner with clear and convincing evidence. See, e.g., Miller-el v. Cockrell, 537 U.S. 322, 354 (2003) (Thomas, J., dissenting) (finding that "Title 28 U.S.C. § 2254(e)(1) requires that a federal habeas court 'presume' the state court's findings of fact 'to be correct' unless petitioner can rebut the presumption "by clear and convincing evidence") (quoting 28 U.S.C. § 2254); Perry v. Kemna, 356 F.3d 880 (8th Cir. 2004) (concluding that under § 2254(e)(1), a state court's findings of fact "are presumed to be correct absent 'clear and convincing evidence' to the contrary" presented by the petitioner).

stated an opinion on the identity of the abuser. Therefore, the trial court did not err in admitting expert opinion testimony that R. had been sexually abused.

\* \* \*

DelVecchio also challenges the trial court's admission of the testimony of the child psychologist, R.'s treating psychologist, and a social worker on R.'s recantation as improper vouching.

Vouching testimony is testimony that another witness is telling the truth or that one witness is to be believed over another witness. See State v. Ferguson, 581 N.W.2d 824, 836 (Minn. 1998) (stating that it was not vouching testimony when witness did not testify that another was telling the truth or that he believed one person over another). Although the psychologists and the social worker did not directly state that they believed R.'s initial story and disbelieved R.'s recantation, their testimony could be construed as vouching.

But this kind of vouching testimony is permissible if the defense "opened the door" by challenging R.'s credibility during the time period in which she reported the abuse. See Myers, 359 N.W.2d at 611-12 (holding that defense had waived objection to responsive expert opinion testimony by seeking to discredit child's testimony with evidence that child's mother did not initially believe her). DelVecchio maintains that, because the trial court admitted expert testimony on whether abuse occurred, the defense had to elicit on cross-examination that the experts believed R.'s reports of sexual abuse and disbelieved her recantation. But, before the experts testified, defense counsel had challenged R's credibility by asking R. if she was lying when she reported the abuse and by asking R.C. if R. lied about other matters, such as stealing. Moreover, vouching testimony occurred on redirect, after the defense had introduced evidence of R.'s recantation. For example, the child psychologist was asked on redirect if the recantation evidence affected her opinions. She replied that she "would still go back to the earlier statements and the recantation and the reaffirmation. It's consistent. There's too much detail. There's [sic] idiosyncratic elements that are there. . . ." Because much of the testimony on recantation occurred in response to the defense's attack on R.'s credibility when she

initially reported the abuse, the testimony was permissible
opinion testimony under <u>Myers</u>.

<u>State v. DelVecchio</u>, No. A05-2013, 2006 WL 3593005 at *3-4 (Minn. Ct. App. Dec. 12,

2006), <u>review</u> <u>denied</u> (Minn. Feb. 20, 2007).

The pertinent expert testimony elicited by the prosecution is as follows.[3]

### 1.   Testimony by Dr. Sandra Hewitt

Dr. Sandra Kay Hewitt, Ph.D. ("Dr. Hewitt") testified at trial regarding the common

behavioral and emotional characteristics that children who have been subjected to

sexual abuse may exhibit, including: sexualized behavior; a child's sense of being

different; behaviors that are out of line; problems with attachment relationships; and

atypical sexuality.  <u>See</u> Jury Trial Transcript ("Tr."), 206-08.  Dr. Hewitt also testified

regarding how children disclose sexual abuse.  Tr. 209-11.

Dr. Hewitt then described why children might recant allegations of sexual abuse.

Tr. 212.  Dr. Hewitt stated that the primary factor in recantation is lack of maternal

support followed by fear of some sort of violence.  <u>Id.</u>  Other recantation factors included

when children feel as though they or their family will be publically exposed for their

abuse, their belief that they caused their parents to split, or having to face judicial

proceedings.  Tr. 212-13.

Dr. Hewitt also testified regarding the differences in recantation between various

age groups.  Tr. 214.

When she examines a child recanting sexual abuse, Dr. Hewitt testified that she

first looks to see what was happening in the child's life—<u>i.e.</u>, was the mother angry at

---

[3]   This Court notes that the parties failed to the point the Court to the relevant
testimony at issue, requiring the Court to conduct a treasure hunt within over 1000
pages of underlying court records and transcripts to find testimony bearing on this issue.

the child because of the effects on the family or whether the perpetrator had access to the child.  Tr. 215-16.   The next factor that Dr. Hewitt examines is the quality of the allegation, which includes the details of the child's statement, if they include other information surrounding the abuse but not relating to the abuse, whether the child could give details as to what happened next, and the quality of the first allegation.  Tr. 216-19.

The prosecutor then had the following exchange with Dr. Hewitt:

> Q.  Now did you do a file review in this case?
>
> A.  Yes, I did.
>
> Q.  Okay.  Did you ever see or talk to [R]?
>
> A.  No.  This was just a paper review.
>
> Q.  A paper review.  And based on that paper review, Dr. Hewitt, are you able to make a conclusion or have - - do you have an opinion as to whether or not this child was sexually abused?
>
> A.  Well, I've not seen all of the data.  Based only on the data that I saw, this child looks most like children that I have seen that have been sexually abused.

Tr. 219-20.

On redirect, the prosecutor discussed with Dr. Hewitt whether R's recantation to her grandmother before the trial and in court would have changed any of the opinions she had rendered:

> Q.  And also, before you testified today, I told you that [R] had recanted when she came into court and testified; is that true?
>
> A.  That's correct.
>
> Q.  All right.  And I don't recall if we had a conversations about [R] recanting to her grandmother prior to trial.  Do –

A. No.

Q. Do you recall that?

A. I don't recall that conversation – a conversation about that.

Q. Had you known that, would that have affected the opinions that you rendered here so far?

A. I would still go back to my earlier statements and the recantation and then the reaffirmation. It's consistent. There is too much detail. There's idiosyncratic elements that are there.

Q. What do you mean by that?

A. Just saying funny things. In some of the data that I read about no, we have sex in lots of the rooms but not in the upper bunk. I mean, why would say that if it wasn't something that happened to you? I mean, a number of those kinds of things that are much more consistent with a child's statement of something that happened to them rather in a fabrication.

Tr. 251. Dr. Hewitt also stated on redirect that she was not surprised that [R] recanted during her trial testimony given that studies show that forcing children to talk in public about what happened to them leads to recantations in many cases. Tr. 252. Dr. Hewitt noted that R felt responsible for causing her family to be divided and that she feared Petitioner. Id. Dr. Hewitt further testified that incidents of false reporting are low among children who claimed to have been sexually abused. Tr. 254. In addition, Dr. Hewitt reiterated that a non-supportive non-offending parent is a primary factor in child recantations of sexual abuse and that if the mother and grandmother were both unsupportive of R that would serve as a "double whammy" in terms of the likelihood of a recantation. Tr. 259-60.

11

## 2.     Testimony by Dr. Raymone Kral

Clinical Physiologist Dr. Raymone Kral, Ph.D. ("Dr. Kral") testified that he saw R

as part of her caseload over a two-year period for a total of 48 sessions starting on

March 20, 2003 through July 21, 2004.  Tr. 336-37, 340-42.  Based on her experience

and the literature in the field, Dr. Kral went over some of the common characteristics of

children who have been sexually abused, which included inappropriate sexual behavior,

acting older, increased anxiety, aggressive behavior, cruelty to others and animals,

brushing up against adults in an inappropriate manner, the lack boundaries, drawing

sexual pictures, exhibiting fear of situations or people, having trouble sleeping, blocking

out major parts of the sexual abuse they experienced, recounting events in a disjointed

fashion, hyper vigilance, difficulty telling the truth, prone to extreme temper reactions,

and they have a limited range of feelings and experiences with a flat affect.

The following exchange then took place between the prosecutor and Dr. Kral:

> Q.  Now, you've indicated that you saw [R] about 48 times over a period of, I think, two—maybe two-and-a-half years. Do you have an opinion, based on your contact with her and your therapeutic relationship, whether or not she has been sexually abused?
>
> A.  Yes, I do.
>
> Q.  And what is that opinion?
>
> A.  I believe she has been sexually abused.
>
> Q.  And did you see some of the characteristics that you've described in [R] while you were working with her?
>
> A.  Yes, I did.

Tr. 348-49.

Dr. Kral went on to describe that R had a flat affect with an extreme amount of fear, inappropriate sexual activity, aggressive rages, difficulty relating to peers, temper tantrums, a problem with lying, and a lack of proper boundaries.  Tr. 349, 353-354, 362, 366, 372.  Dr. Kral noted that once R had given her a great deal of detail of the sexual abuse, she became relaxed and was able to show an appropriate range of emotions. Tr. 349.  Dr. Kral also acknowledged that R recanted her allegations of abuse during their consultations.  Tr. 350.  Based on her experience and the research, Dr. Kral testified that it was not uncommon for children to recant (as they want to please adults), where there is pressure to recant or if they are threatened.  Tr. 351.  Dr. Kral testified that she saw factors in R's case that might have caused her to recant, including pressure from her mother to stop lying about what happened and her mother's use of profanity against R in this regard.  Tr. 351-353.

Dr. Kral was asked whether the evidence of recantation changed her opinion regarding whether R had been sexually abused and he replied, "[n]o.  No, it doesn't." Tr. 355.

### 3.    Testimony by Paula Stocke

Social worker Paula Stocke ("Stocke") testified as to some of the factors that can contribute to the recantation of sexual abuse.  Tr. 478.  Some of the facts included: if the offender was a family member; if the offender is denying the abuse; if there is a history of family violence; if there are no mental health services being offered to the victim; if there is contact between the non-offending caregiver and the alleged offender, if there is exposure of the victim to the offender; if the child feels unsafe or threatened;

and if the non-offending caregiver is not expressing any support.  Tr. 478-79.  Stocke

was then asked:

> Q.  Did you see any of the factors in this case?

> A.  Yes, I would say all of those were present.

Tr. 479.

According to Petitioner, the credibility of a witness is for the jury to decide and not

a witness.  See Petitioners' Response to Respondent's Answer to Petition of Writ of

Habeas Corpus ("Petitioner's Mem.") at p. 5.   Petitioner argued that because the

prosecutor improperly elicited testimony that others believed R's allegation that she had

been sexually abused and that they believed her recantations were false, such vouching

testimony improperly invaded the jury's credibility determination so as to deprive him of

due process of the law.  Id.  Respondent argued that Minnesota law allowed the

admission of expert testimony on the behavioral characteristics of a child consistent with

sexual abuse and that admissibility of evidence under state law was not a question that

a federal court can consider on federal habeas review.   See Respondent's

Memorandum in Support of Answer to Petition for Writ of Habeas Corpus

("Respondent's Mem.") at pp. 6-7 (citing State v. Meyers, 359 N.W.2d 604 (Minn. 1984);

State v. Dana, 422 N.W.2d 246, 250-251 (Minn. 1988)) (citation omitted).

Minnesota and the Eighth Circuit have reached different conclusions regarding

the admissibility of expert testimony on the issue of whether a child victim has been

abused.  In 1984, the Minnesota Supreme Court held that a case involving the sexual

abuse of a child is "one of those 'unusual cases' in which expert testimony concerning

credibility of a witness should be received."  Myers, 359 N.W.2d at 610.  Since that

decision, Minnesota state courts have consistently held that expert testimony on whether a child has been sexually abused is properly admissible.  See Dana, 422 N.W.2d at 250-251; State v. Hollander, 590 N.W.2d 341, 349 (Minn. Ct. App. 1999); see also State v. Hanson, No. A03-1020, 2004 WL 1557591 at *5 (Minn. Ct. App. July 13, 2004) ("The basic consideration in admitting expert testimony under Minn. R. Evid. 702 is whether it will assist the jury in resolving the factual questions presented."). Minnesota courts admit expert-opinion testimony regarding whether a child has been sexually abused because such testimony does not go to the ultimate issue in the trial. See Dana, 422 N.W.2d at 250-51; see also State v. Flemino, No. C5-02-617, 2003 WL 21061236 at *8 (Minn. Ct. App. May 13, 2003) ("Here, [the expert] did not render an opinion as to whether [the victim] was telling the truth. Rather, she rendered her expert opinion as to whether [the victim] had been sexually abused. While [the expert's] testimony may have helped the jury to determine whether [the victim's] testimony about being sexually abused was truthful, [the expert] did not evaluate [the victim's] statements for truthfulness or falsity. Likewise, [the expert] did not testify that Flemino himself was guilty of committing the abuse that [the victim] has suffered. In light of our decision in Hollander, 590 N.W.2d at 349, the district court did not err in admitting [the expert's] testimony that [the victim] was sexually abused."); Hollander, 590 N.W.2d at 349 (relying on Dana to conclude that expert testimony regarding whether a child has been sexually abused was properly admitted).").

On the other hand, the Eighth Circuit has held that "[a] qualified expert may inform the jury of characteristics of sexually abused children and describe the characteristics exhibited by the alleged victim but may not state an opinion that sexual

abuse has in fact occurred." United States v. Johns, 15 F.3d 740, 743 (8th Cir. 1994) (citations omitted);[4] see also United States v. Azure, 801 F.2d 336, 340-41 (8th Cir. 1986) (expert opinion on truthfulness of particular child abuse victim invaded province of jury in federal criminal trial). Indeed, the Eighth Circuit has reiterated that "[i]n child sexual abuse cases, 'a qualified expert can inform the jury of characteristics in sexually abused children and describe the characteristics the alleged victim exhibits.' An expert, however, cannot express an opinion that sexual abuse has in fact occurred or vouch for the victim." United States v. Eagle, 515 F.3d 794, 800 (8th Cir. 2008) (quoting United States v. Kirkie, 261 F.3d 761, 765-66 (8th Cir. 2001)) (internal citations omitted) (allowing testimony "regarding characteristics of sexually abused children in general and as they compared with the characteristics exhibited by the victim in this case"); see also United States v. Two Elk, 536 F.3d 890, 903-04 (8th Cir. 2008). ("In child sexual abuse cases, a qualified expert can inform the jury of characteristics in sexually abused children and describe the characteristics the alleged victim exhibits.") (marks and citations omitted).

The United States Supreme Court has not spoken on the issue whether the admission of expert testimony that the victim has been sexually abused denies a petitioner of due process. Thus, Petitioner cannot show that Minnesota's stance on this issue is contrary to federal law as articulated by the Supreme Court. In addition, as the Respondent pointed out, "[q]uestions relating to the admissibility of evidence are matters of state law and are generally not cognizable in an action for habeas corpus."

---

[4]     The expert in Johns, described the emotional and psychological traits of abuse victims that often account for behavior such as delay in reporting the abuse or failure to escape. See Johns, 15 F.3d at 743.

Wood v. Lockhart, 809 F.2d 457, 459 (8th Cir. 1987) (citing Maggitt v. Wyrick, 533 F.2d 383, 385 (8th Cir.), cert. denied, 429 U.S. 898 (1976)).   "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).   Accordingly, this Court may only examine this state court's evidentiary ruling in this habeas proceeding to determine whether the asserted error denied due process.   See Bailey v. Lockhart, 46 F.3d 49, 50 (8th Cir. 1995) (per curiam); see also Harris v. Bowersox, 184 F.3d 744, 752 (8th Cir. 1999) ("Because questions concerning the admissibility of evidence are matters of State law, proceedings is limited to determining whether the defendant's constitutional rights have been violated.") (citing Rainer v. Dept. of Corrections, 914 F.2d 1067, 1072 (8th Cir. 1990), cert. denied, 498 U.S. 1099 (1991)).

In order for a habeas petitioner to prove that a state court evidentiary ruling violated his right to due process, "the alleged error [must be] so conspicuously bad that it fatally infected the trial and rendered it fundamentally unfair." Gee v. Groose, 110 F.3d 1346, 1350 (8th Cir. 1997) (citation omitted).

> To carry that burden, the petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial-i.e., that absent the alleged impropriety the verdict probably would have been different. In assessing whether this burden has been met, the following are of particular importance: the frequency and pervasiveness of the alleged misconduct in the context of the entire trial; the weight of the evidence supporting guilt; and whether the trial judge gave a cautionary instruction to the jury.

Gee, 110 F.3d at 1350 (citations and marks omitted).

Here, the majority of the expert testimony rendered on direct examination from Dr. Hewitt, Dr. Kral and Stocke dealt with the characteristics of sexually abused children in general and those children that later recant sexual abuse, as they compared with the characteristics exhibited by R in this case.  Such testimony is not improper vouching testimony.  See Bachman v. Leapley, 953 F.2d 440, 442 (8th Cir. 1992) (finding that there is no issue where an expert "therapist testified that a victim's behavior was consistent with that of other sexually abused children.") (citing United States v. Plenty Arrows, 946 F.2d 62 (8th Cir. 1991)); see also Eagle, 515 F.3d at 800; Kirkie, 261 F.3d at 765-66; Two Elk, 536 F.3d at 903-04; Johns, 15 F.3d at 743.

In this case, the only direct testimony obtained by the prosecution regarding whether R had been sexually abused, as opposed to comparing R's characteristics to those typical of children who are abused, was as follows:

> Q.  Now, you've indicated that you saw [R] about 48 times over a period of, I think, two –maybe two-and-a-half years. Do you have an opinion, based on your contact with her and your therapeutic relationship, whether or not she has been sexually abused?
>
> A.  Yes, I do.
>
> Q.  And what is that opinion?
>
> A.  I believe she has been sexually abused.
>
> Q.  And did you see some of the characteristics that you've described in [R] while you were working with her?
>
> A.  Yes, I did.

Tr. 348-49 (emphasis added).  In addition, Dr. Kral testified that the recantation did not affect her opinion that R had been sexually abused.  Tr.  355.

Since here, expert testimony was admitted in a state court case that the R had been sexually abused, the Court must decide whether its admission "is of a constitutional dimension; that is, whether it is so prejudicial as to be fundamentally unfair, thus denying the [Petitioner] a fair trial." Engesser 457 F.3d at 736. Stated otherwise, this Court must determine whether the verdict would have been different but for the admission of Dr. Kral's testimony. See Gee, 110 F.3d at 1350. .

Given the totality of circumstances in this case, this Court finds that Petitioner has failed to demonstrate that the verdict would have been different but for the admission of Dr. Kral's testimony. See Gee, 110 F.3d at 1350. As set forth below in this Court's discussion of Petitioner's sufficiency of the evidence claim (Report and Recommendation, Section III.B, infra), even without Dr. Kral's statement with regards to whether R was sexually abused, there is substantial evidence in the record to support the conviction against him. Further, limiting the effect of Dr. Kral's statement is the fact that the trial judge provided an explicit jury instruction that "you are the sole judges if whether a witness is to be believed and of the weight to be given a witness' testimony" (Tr. 905) and that the jurors were not required to give expert opinion evidence "any more or less consideration . . . than any other evidence" (Tr. 906). See Bachman, 953 F.2d at 442. As such, this Court finds that the testimony of the experts did not violate Petitioner's due process right to a fair trial, and that the state court's decision did not amount to an unreasonable application of federal law.

### B. Ground Two: Sufficiency of Evidence

In Ground Two, Petitioner alleged that the evidence submitted at trial was insufficient as a matter of law to sustain his conviction when there was no direct

evidence that Petitioner was guilty of the charged offense.  <u>See</u> Petition at p. 5.   In his

memorandum, Petitioner reiterated that his right to due process was violated, as the

evidence showed that the he and R were the only two people who knew for certain

whether Petitioner abused her and both testified that he did not.  <u>See</u> Petitioner's Mem.

at p. 6.  Petitioner also noted that R testified that her father had never touched in a way

she did not like and that she lied about the abuse because she was being spanked by

her father and because she had seen him push her mother into a washing machine.  <u>Id.</u>

In addition, Petitioner asserted that the evidence showed that R testified that she was

not pressured by anyone to recant and that the medical and forensic evidence did not

support the assertion that any sexual misconduct had ever taken place.   <u>Id.</u>

Respondent countered there was ample evidence to support the essential elements of

the crime beyond a reasonable doubt in the form of two detailed statements from R

detailing sexual abuse, R's sister stating that R had told her about the sexual abuse and

her observations of Petitioner taking R into his bedroom on several occasions.  <u>See</u>

Respondent's Mem. at pp. 7-8.

According to the United States Supreme Court, the critical inquiry in reviewing

the sufficiency of the evidence for a criminal conviction is:

> whether the record evidence could reasonably support a
> finding of guilt beyond a reasonable doubt.  But this inquiry
> does not require a court to 'ask itself whether <u>it</u> believes that
> the evidence at the trial established guilt beyond a
> reasonable doubt.'   Instead, the relevant question is
> whether, after viewing the evidence in the light most
> favorable to the prosecution, <u>any</u> rational trier of fact could
> have found the essential elements of the crime beyond a
> reasonable doubt.

Jackson v. Virginia, 443 U.S. 307, 318-19 (1979) (quoting Woodby v. INS, 385 U.S. 276, 282 (1966)) (emphasis in original).

Consistent with this articulation of the Court's role in a habeas case by the Supreme Court, the Eighth Circuit has described the standard of review of insufficiency of the evidence claims as follows:

> Our standard of review is as narrow as it is well-established: This court must view the evidence in the light most favorable to the government and sustain the verdict if it is supported by substantial evidence.  Moreover, on appeal, the government must be given the benefit of all inferences that may logically be drawn from the evidence.  It is not necessary that the evidence exclude every reasonable hypothesis except guilt; instead, the evidence is simply sufficient if it will convince a trier of fact beyond a reasonable doubt that the defendant is guilty.  This court will not disturb a conviction if the evidence rationally supports two conflicting hypotheses.  Each of the elements of the crime charged may be proven by circumstantial evidence, as well as by direct evidence.  And finally, this court must keep in mind that the standard to be applied to determine the sufficiency of the evidence is a strict one, and the finding of guilt should not be overturned lightly.

Hill v. Norris, 96 F.3d 1085, 1088 (8th Cir. 1996) (emphasis added) (quoting United States v. Brown, 921 F.2d 785, 791 (8th Cir. 1990)).  "Our function as an appellate court is not to re-weigh the evidence.  To the contrary, we must accord 'great deference' where a state appellate court has found the evidence supporting the conviction constitutionally sufficient," as is the case here.  Id. (citations omitted); see also Blair-Bey v. Nix, 44 F.3d 711, 713 (8th Cir. 1995) (finding that, in evaluating claims that the evidence was insufficient to find guilt, courts must examine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"); Redding v. State, 881 F.2d 575, 578 (8th Cir. 1989) (holding that in "evaluating sufficiency of the

evidence in habeas corpus petitions, we view the evidence in the light most favorable to the prosecution and determine 'whether <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'") (citations omitted) (emphasis in original).

The conclusion of the Minnesota Court of Appeals was that viewing the evidence in the light most favorable to the verdict, the evidence presented at trial was sufficient to support the conviction for all counts of criminal sexual conduct against Petitioner based on the following:

> The direct evidence is sufficient to sustain the jury's verdict.
>
> Although R. recanted the allegations made in her first police interview, she reconfirmed the allegations in her second police interview and stated that she had told the first investigator the truth. In both interviews, R. supplied details of the abuse. The jury was entitled to determine that R.'s interview statements to police were credible, especially when the second interview was done after she had reportedly recanted. Weighing witness credibility is a task for the jury, not a reviewing court. <u>State v. Garden</u>, 404 N.W.2d 912, 916 (Minn. Ct. App.1987), <u>review</u> <u>denied</u> (Minn. June 25, 1987).
>
> R.C.'s testimony also supports the jury's verdict. Although on cross-examination, R.C. stated that R. told her about the abuse so that the girls would not have to go back to DelVecchio, R.C. also stated that, on several occasions, she had seen R. and DelVecchio go into a room and shut the door. R.C. testified that, although R. told her not to tell their mother, she did tell, because "it was something important, so then it won't happen again."
>
> Other evidence also supports the inference that R.'s recantation was not credible. The GAL testified that, when R. was in foster care, R. appeared to be taking on the blame for the break-up of the family. The social worker testified about her knowledge that DelVecchio's wife indicated to R. that what DelVecchio did was "a horrible thing," and that she would like to believe it was not true. DelVecchio's argument

that the evidence does not support the verdict is without merit.

DelVecchio, 2006 WL 3593005 at *4-5.

Sergeant Sally Ann Burns ("Sergeant Burns"), with the St. Louis County Sheriff's Department, testified that on October 23, 2002, she interviewed R at the First Witness Child Abuse Center. Tr. 150-51. The video-taped recording of the interview was shown to the jury. R had the following exchange with Sergeant Burns:

[R]: My dad . . . came in my bed and he, like, does sex with me sometimes and I don't like that.

SERGEANT BURNS: he does sex with you sometimes and you don't like that?

[R]: Un-hum. I ask him to stop but he never stops.

SERGEANT BURNS: Can you tell me what sex means?

[R]: Yeah, when they -- when they – when they put their thing in your bottom and then take some skin is off of it, like some skin is, like, I don't know what kind of skin but it goes down a little bit or it's gone.

* * *

SERGEANT BURNS: Okay. Okay. And who gives you touches like that, like you're talking about?

[R]: Only my dad.

SERGEANT BURNS: Only your dad.

[R]: Um-hum.

SERGEANT BURNS: Okay. And what does he touch your bottom with?

[R]: His, that thing right there. His bottom.

* * *

> SERGEANT BURNS:   So when your dad touches your bottom with his bottom, does this happen, like, in the morning or at nighttime or in the afternoon?

> [R]:     Sometimes at night an afternoon if mom goes somewhere with my sisters, and then he does it in the afternoon, at night and in the morning when my mom leaves.

> SERGEANT BURNS:  Does it happen only once or twice or a whole bunch of times?

> [R]:  A whole bunch of times.

Tr. 172-175.

R also went on to tell Sergeant Burns that it hurt her when her father had sex with her, which rooms in the house that the sex took place and that the last time it happened was on a bus on the family's property.  Tr. 175-88.  Petitioner acknowledged during an audio-taped recording, played to the jury, that he spent a night with R in the bus.  Tr. 281-82, 287.  R also provided detail about what she was or was not wearing when the assaults took place.  Tr. 173-188.

Petitioner testified at trial that he never sexually abused R.  Tr. 831.

R.C., R's sister, testified that R told her a "secret" that Petitioner "did it with me."  Tr. 118.  R.C. also testified that both R and Petitioner told R.C. not to tell anyone about this secret (Tr. 119, 135); that R told R.C. not to tell their mother about this secret (Tr. 133, 137); and that on multiple occasions when she, R and Petitioner were home alone, she observed Petitioner and R going into Petitioner's room and closing the door.  Tr. 120.  In addition, R.C. testified on cross-examination that R had told her that maybe if she made allegations against R then maybe he would not be around any longer.  Tr. 128-29.

24

Although Sergeant Burns obtained a sample from R's mattress on November 14, 2002, no semen or DNA evidence was obtained from it.  Tr. 196-97, 328.  Sergeant Burns explained that it was rare to find any physical evidence, especially after a period of time has elapsed.  Tr. 197.  The medical evaluation of R's genital area was normal, however, Dr. Katherine Halvorson ("Dr. Halverson"), who conducted a paper review of R's medical records, testified that the majority of physical examinations of alleged child sexual abuse cases are normal. Tr. 386, 388, 394, 414.  Dr. Halverson also testified that a normal examination neither proves nor disproves the possibility of sexual abuse.  Tr. 416-17.

Brenda Servaty ("Servaty"), R's guardian ad litem, testified that in November 2002 R asked her if she had heard about the "sex stuff.  Tr. 652.   R then told Servaty, "[y]ou know it's not true?"  Id.  R also told Servaty that she was scared and that she did not want to see her dad because he banged her mother's head into the washing machine, he would try to hit her mother, her father spanked her and made her stay in the corner, and he spanked her sister with a belt. Tr. 652-53.  On January 22, 2003, R told Servaty that Petitioner had bashed her mother's head into the washing machine and she just wanted him away from her mother.  Tr. 661-62.  R again recanted to Servaty on July 17, 2003.  Tr. 655-56.  Servaty also testified that one of her concerns was that R was taking on the blame for being out of the family house and being separated from her siblings.  Tr. 667.

Paula Stocke, a child protection social worker, testified that R's mother, Susan Delvecchio, told her that R had recanted her sexual abuse claim on December 4, 2002.  Tr. 497.   This was before R had been taken away from Susan DelVecchio.  Id.

Sergeant Burns also testified that on December 2, 2002, R's mother called and told her that R had recanted.  Tr. 330-31, 335.

Investigator Bill Evans ("Investigator Evans"), a Deputy Sheriff with the St. Louis County's Sheriff's Department, testified that he was asked by Sergeant Burns to conduct an interview of R.  Tr. 515.  The interview took place on December 17, 2002 and the taped interview was played for the jury. Tr. 515, 517.  R told Investigator Evans that her father "do sex with me. . . ."  Tr. 525.  R told Investigator Evans that her father was too heavy to push him off of her.  Tr. 525, 527.  R also confirmed to Investigator Evans that everything she had told Sergeant Burns was the truth and that she had not made anything up during that interview. Tr. 525-26.  Investigator Evans stated that R told him that her father told her not to tell anyone that he was having sex with her.  Tr. 526-27.  Investigator Evans also testified that Susan DelVecchio told R not to tell her friends or the office at school about the sexual abuse because they might call the police. Tr. 531.

On February 10, 2003, R saw psychologist Dr. Brenda Bergman who testified that R volunteered at their meeting that she had decided that she would make up the allegation of sexual abuse against Petitioner in order to split the family up because she was afraid that Petitioner would kill her mother.  Tr. 607-08.

On March 20, 2003, R began seeing a clinical physiologist and family therapist, Dr. Kral.  Tr. 340.  Dr. Kral testified that R told her about the sexual abuse on several occasions.  Tr. 349-350.  In addition, Dr. Kral testified that R recanted her allegations to her only on two separate occasions.  Tr. 350, 362.  Dr. Kral also testified that on July 24, 2003, R's grandmother called her and reported that R had started crying after

speaking with her mother on the telephone and that R would not stop.  Tr. 352.  The next day, R reported to Dr. Kral that her mother had called her and told her to "[s]top your lying about this" and that R's mother used "very bad language" during the conversation.  Tr. 352-53.  R was upset because her mother had broken her promise that she would not tell R that she was lying about what occurred.  Tr. 353.

Sharon Carlson, the maternal grandmother of R and adoptive parent, testified that in February of 2005, R told her that she had lied about what her father did to her. Tr. 698-701.  R also told Carlson that she was upset with her mother because she would not protect the children from spanking or other discipline at the hands of Petitioner.  Tr. 702.  R testified at trial that her grandmother had not pressured her to recant.  Tr. 97.

On April 1, 2005, R started seeing clinical psychologist Kimberly Schmidt ("Schmidt") in order to give her support for the trial because her grandmother thought it would be stressful for R.  Tr. 573.  Schmidt saw R individually for only one session.  Tr. 598.  According to Schmidt, R told her that she made the accusation of sexual abuse against Petitioner because she wanted some time away from her father due to the spankings he gave her and because he pushed her mother into the washing machine. Tr. 574.  Both R's mother and grandmother were present during the first consultation. Tr. 578.  During the second visit on May 2, 2005, Schmidt met with R alone and R reiterated that Petitioner did not sexually abuse her and that she had lied because she was afraid of her father at the time.  Tr. 579.  R also stated that she obtained the idea of sexual abuse from a watching people having sex on television.  Id.

R testified at trial on April 27, 2005, that while she had told Sergeant Burns that her father had touched his "bottom" inside of her bottom, that had not really happened. Tr. 59-60, 105.  R testified that Petitioner had never touched her in a "bad way."  Tr. 95. She also testified that the allegations of sexual abuse that she made to Investigator Evans were not true.  Tr. 75.  R denied the assertion that her mother ever told her to stop lying about the sexual abuse.  Tr. 73.  R testified that it has been hard for her to be separated from her family.  Tr. 85.  When asked about why she made the sexual abuse allegation regarding her father, R testified that she made the accusations because Petitioner used to spank the kids when they did something wrong and because she was afraid for her mother because Petitioner had "banged" her against the washing machine.  Tr. 86.  R further stated that she was upset with her mother as she did not stop Petitioner from disciplining her by spanking her with a belt.  Tr. 103.

Viewing the evidence in the light most favorable to the prosecution, this Court finds that a rational trier of fact could have concluded beyond a reasonable doubt that Petitioner sexually assaulted R.    In particular, R, in her first statement to law enforcement told Sergeant Burns that Petitioner sexually abused her on numerous occasions and provided details on the how, when and where of the abuse.  Tr. 172-88. While there was no physical or medical evidence collected that supported the claim of sexual assault, both Sergeant Burns and Dr. Halverson testified that the absence of physical or medical evidence did not mean that sexual abuse did not occur.  Tr. 196-97, 386, 388, 394, 414, 416-17.  Further, R.C., R's sister, testified that R told her a "secret" that Petitioner "did it with me" and also told her not to tell her mother or anyone else.  Tr. 118, 119, 133, 135, 137.  R.C. also testified that on multiple occasions when she, R and

Petitioner were home alone, she observed Petitioner and R going into Petitioner's room and closing the door, thereby corroborating R's claims of sexual abuse.  Tr. 120.  While there is evidence that R recanted in November and December of 2002 (Tr. 330-31, 335, 497, 652), Investigator Evans testified that on December 17, 2002 R told him that her father "did sex with me" and confirmed to Investigator Evans that everything she had told Sergeant Burns was the truth and that she had not made anything up during that interview.  Tr. 525, 527.  R again recanted on February 10, 2003, to Dr. Bergman who testified that R volunteered at their meeting that she had decided that she would make the allegation of sexual abuse against Petitioner in order to split the family up because she was afraid that Petitioner would kill her mother.  Tr. 607-08.  R again made several assertions of sexual abuse, starting on March 20, 2003, to Dr. Kral.  Tr. 340, 349-350.

The record is also contains further evidence of R recanting to several individuals including Dr. Kral, her guardian ad litem, her adoptive maternal grandmother, and Dr. Schmidt.  Tr.  350, 574, 579, 655, 701.  In addition, R testified at trial she was not sexually abused by Petitioner.  Tr. 59-60, 103, 105.  However, Dr. Hewitt testified regarding common characteristics of sexually abused children, how children report sexual abuse, factors that lead children to recant allegations of sexual abuse including: a lack of maternal support; feeling that they are causing the family to split; and facing a judicial proceeding.  Tr. 206-13.  Dr. Hewitt then testified that R displayed characteristics of those children that have been sexually abused.  Tr. 219-20.  In addition, Dr. Hewitt testified that R's recantation fit the model of many children who recant due to the fact that R felt responsible for splitting up her family, she was afraid of Petitioner, she was facing public examination and her lack of maternal support.  Tr.

252, 259-60.  Similarly, Dr. Kral described based on her experience and the research, that it was not uncommon for children to recant.  Tr. 351.  Dr. Kral testified that she saw factors in R's case that might have caused her to recant, including pressure from her mother to stop lying about what happened.  Tr. 351-353.  Child protection worker Stocke also testified as to some of the factors that can contribute to the recantation of sexual abuse (including if the non-offending caregiver is not expressing any support) and testified that all of these factors were present in R's case.  Tr. 478-79.  Indeed, the record contained evidence that R was taking on the blame for being out of the family house and being separated from her siblings, her mother had called R and told R to stop lying about the abuse, her mother was present at the initial consultation with psychologist Kimberly Schmidt in April of 2005 where R recanted, and R testified at trial that it has been hard for her to be separated from her family.  Tr. 85, 352-53, 667.

Based on the evidence discussed above, this Court finds that verdict is supported by substantial evidence given the multiple allegations of sexual abuse by R, the corroboration of R.C. that Petitioner took R into his room on numerous occasions and shut the door, and the testimony of experts regarding the characteristics of those children that recant compared to the characteristics of R.  While the evidence may rationally support a conflicting hypothesis given that R has recanted, this is not a basis for this Court to disturb the jury's conviction.  See Hill, 96 F.3d at 1088; see also Blair-Bey, 44 F.3d at 713 (citing Jackson, 443 U.S. at 326) (finding that even if the evidence allows conflicting inferences, the reviewing court must presume that the jury resolved the conflicts in favor of the state).  Moreover, this Court will not invade the jury verdict as it relates to the credibility of Petitioner and R.  Perry, 356 F.3d at 885 ("Federal habeas

review 'gives federal courts no license to redetermine [the] credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.'"), cert. denied, 543 U.S. 1022 (2004) (quoting Marshall v. Lonberger, 459 U.S. 422, 434 (1983)).

For all of these reasons, the Minnesota court of appeals' conclusion that the evidence was legally sufficient to sustain Petitioner's conviction is not an unreasonable determination of the facts based on the evidence as a whole.   See 28 U.S.C. § 2254(d)(2).  Accordingly, Petitioner's claim for relief should be rejected and Ground Two of the Petition be dismissed.

**C.     Ground Three:  Denial of Fair Trial Due to Leading and Confusing Questions Posed During Direct Examination**

Under Ground Three of the Petition, Petitioner claimed that he was denied a fair trial due to the trial court's refusal to grant him a mistrial after the prosecution asked leading and confusing questions of R on direct examination.   In particular, Petitioner pointed to the fact that the prosecution began asking leading questions to R about what she reported to the police after she refused to testify that Petitioner sexually abused her. See Petitioner's Mem. at p. 7, referring to Appellant's Brief in State v. DelVecchio, No. A05-2013 at p. 42.  Despite his objection, the trial court allowed the leading questions to continue.   Id.   After the prosecution changed the tone of the questioning, Petitioner renewed the objection given that it was becoming unclear as to whether R was agreeing with the allegation propounded to her or whether she was stating that that she had previously made such a statement.   Id.  While the trial court sustained the objection, it would not strike the answers or grant his motion for a mistrial.   Id. at pp. 42-43.

The Minnesota Court of Appeals held that:

The record supports DelVecchio's argument that the use of leading questions allowed the prosecutor to reach the direct question of whether DelVecchio told R. not to say anything about the abuse. But, as the trial court pointed out, the question would have been admissible on direct examination. Finally, R.'s inconsistent answers to other questions suggest that the leading questions did not prompt her to answer one way or the other. The trial court did not abuse its discretion by denying DelVecchio's motion for a mistrial.

DelVecchio, 2006 WL 3593005 at *6.

The relevant testimony is as follows:

Q.  You told her that your dad touched your bottom with his bottom, didn't you?

A.  Yes.

Q.  And, in fact, do you remember, [R], that you drew her a picture of your bottom?

A.  No.

Q.  Okay.  And did you tell her that there was a hole in your bottom that your dad put his thing in?

A.  No.

Q.  You didn't tell her that?

A.  No.

MR. MALBAN:  Your Honor, we're going to object to the leading questions at this point.

Tr. 53-54.  The trial court ruled:

I have in mind that this is an unusual situation in the term of the age and maturity of the witness and the circumstances of the testimony.  I am going to permit leading questions.  The objection to leading questions is overruled.

Tr. 57.  The prosecution then continued its line of questioning:

Q.  Okay.  And before you went to the First Witness, you told your mom about some things that your dad had done, right?

A.  Yes.

Q.  Okay.  Then you went to First Witness, is that right?

A.  Yes.

Q.  And you talked to Sally?

A.  Yes.

Q.  And you told her things that your dad had done to you, isn't that right.

A.  Yes.

Q.  Now some of those things that you talked about was something that happened in the bus, isn't that right?

A.  Yes.

Q.  This bus that you and your dad stayed overnight in at your old house, is that true?

A.  Yes.

Q.  And what did you tell her?

A.  That my dad touched me.

Q.  Okay.  And you told her that he touched you with his bottom, didn't you?

A.  Yes.

Q  Inside of your bottom, is that true?

A.  Yes.

Q.  And you told her it hurt?

A.  No.

Q.  And that's what happened, isn't it?

A.  No.

\* \* \*

Q.  And you told her that it happened on your bed, is that right?

A.  Yes.

Q.  And on your sister's bed, bunk bed, is that right?

A.  What?

Tr. 58-61.

Petitioner's trial counsel then renewed his objection which was again overruled by the trial court.  Tr. 61.  The prosecutor resumed questioning:

Q.  [R], did you tell Sally Burns that it happened in your mom and dad's room?

A.  No.

Q.  And you told her it happened in your room?

A.  Yes.

Q.  And it happened in [R.C.]'s bed?

A.  No.

Q.  You told her that your dad said he was going to stop, didn't you?

A.  Yes.

Q. Okay. But that he didn't stop, is that right?

A.  Yes.

Q:  Now, your dad told you not to tell anybody about this, didn't he?

A.  Yes.

Q: What did he say?

Tr. 61.

Petitioner's counsel again objected to the use of leading questions and that the prosecutor was, in a subtle manner, shifting questions from what R told Sergeant Burns to questions as to what actually what had happened, which was very confusing.  Tr. 63-64.  The trial court sustained the objection, citing the dangers of using leading questions on an 11-year old witness.  Tr. 68.  However, the trial court refused to strike the answer to the question of whether R's dad told her not to tell anyone, or issue a curative instruction, so as to avoid drawing the jury's attention to the question and answer and based on the court's belief that it did not have to determine whether the juror's were confused.  Tr. 68-69.  The trial court also denied Petitioner's motion for a mistrial based this exchange, noting that although the question came quickly, it was not confusing.  Tr. 70-71.

A ruling permitting the prosecution to ask leading questions, a matter of state evidentiary law, is only reviewable in a federal habeas corpus proceeding to determine whether it resulted in a trial so fundamentally unfair as to deny Petitioner due process.  See Wallace v. Lockhart, 701 F.2d 719, 725 (8th Cir. 1983), cert. denied 464 U.S. 934 (citing Batten v. Scurr, 649 F.2d 564, 569 (8th Cir.1981)).  While leading questions are general not allowed during the direct examination of a witness, the Eighth Circuit has concluded that trial courts "have the discretion to depart from this routine, particularly when the witness is a young victim."  United States v. Demarrias, 876 F.2d 674, 678 (8th Cir. 1977) (citing United States v. Littlewind, 551 F.2d 244, 245 (8th Cir. 1977)).  As such, this Court concludes that the trial court's decision to allow the prosecution to ask

R leading questions, as a young victim, was not an unreasonable application of federal law. In addition, the Court concludes that the refusal by the trial court to declare a mistrial, based on the answer to the question of whether R's dad told her not to tell anyone, did not result in a trial so fundamentally unfair so as to deny Petitioner a fair trial for the purposes of due process, especially given that on cross-examination his counsel was able to elicit from R that Petitioner had not sexually abused her so as to clear up any possible confusion. Tr. 95. See Wallace, 701 F.2d at 725 ("Wallace could not have been prejudiced by the question "who hit Calvin Smith?" because his own testimony established that Calvin Smith was hit. Finally, Wallace was given the opportunity to rebut the testimony of Harris and Hallman by cross-examination and by providing his own testimony that he never hit Smith.").

As such, Petitioner's claim for relief should be rejected and Ground Three of the Petition be dismissed.

### D.   Ground Four: Brady Violation

In Ground Four, Petitioner asserted that the Prosecutor violated his constitutional rights because the prosecution withheld exculpatory Brady[5] evidence. Petitioner argued that a Brady violation occurred because the State failed to disclose Sergeant Burn's findings regarding the presence of DNA from the piece taken from R's bed mattress or that any testing had been performed. See Petitioner's Mem. at p. 7, Pro Se Supplemental Brief in State v. DelVecchio, No. A05-2013 at p. 3. The Respondent argued that the absence of the DNA finding was provided to Petitioner two years prior to trial, that the report was provided to Petitioner as soon as it was received by the

---

[5]     Brady v. Maryland, 373 U.S. 83 (1963).

prosecution and that the report was admitted into evidence at trial.  Based on these

facts, the Respondent claimed that there was no <u>Brady</u> violation in this case.  <u>See</u>

<u>Respondent's Mem.</u> at p. 9.

With regards to his <u>Brady</u> claim, the Minnesota Court of Appeals concluded:

> The three components necessary for a "'true <u>Brady</u> violation'" are that (1) the evidence at issue is favorable to the accused, (2) the evidence was willfully or inadvertently suppressed by the state, and (3) prejudice to the accused resulted. Pederson v. State, 692 N.W.2d 452, 459 (Minn.2005) (quotation omitted).
>
> DelVecchio moved before trial for acquittal based on the state's failure timely to disclose the BCA report. The trial court denied the motion, determining that defense counsel had notice one or two years before trial that the samples of material to be tested showed nothing; that the prosecutor disclosed the actual DNA test report to the defense as soon as she received it, which was the day before the hearing; and that, because of the prior knowledge of the lab results and the recent discovery of the written report, the defense was not harmed by the late disclosure.
>
> DelVecchio has not established that the late disclosure of the lab report violated his due process rights under <u>Brady</u>. Although the report was exculpatory and was inadvertently suppressed by the state, the defense knew that the testing had shown no results at least a year before trial. And because the report was admitted at trial, DelVecchio has failed to show prejudice from its late disclosure.

<u>DelVecchio</u>, 2006 WL 3593005 at *6.

In the Eighth Circuit, "the rule of <u>Brady</u> is limited only to the discovery, <u>after trial</u>,

of information which had been known to the prosecution but unknown to the defense . . .

.[;] where the prosecution delays disclosure of evidence, but the evidence is

nonetheless disclosed during trial, <u>Brady</u> is not violated." <u>United States v. Gonzales</u>, 90

F.3d 1363, 1368 (8th Cir. 1996); see also Henderson v. Minnesota, No. Civ. 03-6507 (JRT/FLN), 2005 WL 5168551 at *17 (D. Minn. July 25, 2005).

In this case, Petitioner had one or two years notice before trial that the samples of material to be tested showed no evidence and the DNA test report was admitted at trial.  Therefore, under Eighth Circuit precedent, there was no Brady violation because all of the evidence was disclosed to the defense before the end of the trial.  See Gonzales, 90 F.3d at 1368 ("Where the prosecution delays disclosure of evidence, but the evidence is nonetheless disclosed during trial, Brady is not violated.") (emphasis added) (citing United States v. Boykin, 986 F.2d 270, 276 n. 6 (8th Cir.), cert. denied, 510 U.S. 888 (1993)); see also Gray v. Houston, No. 4:07CV3099, 2008 WL 244225 at *2 (D. Neb. Jan. 28, 2008) (finding no Brady violation where information was disclosed during trial).  For this reason, this Court finds that the state court's decision regarding exculpatory evidence did not amount to an unreasonable application of federal law.

## IV.    RECOMMENDATION

For the reasons set forth above and based on all the files, records, and proceedings herein, IT IS RECOMMENDED that Alan Lee Delvecchio's Petition for Habeas Corpus by a Person in State Custody [Docket No. 1] be **DISMISSED WITH PREJUDICE**.

Dated:       June 14, 2011

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **June 28, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.